IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| FODS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.:1:23-cv-59 |
| | ) | |
| LOW IMPACT TECHNOLOGIES USA, INC. and D&D MANUFACTURING, LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff FODS, LLC ("FODS"), through its undersigned counsel, hereby alleges as follows:

## I.  THE PARTIES

1.      FODS is a limited liability company organized and existing under the laws of the state of Colorado, with its principal place of business at 7328 S. Revere Parkway, #204B, Centennial, CO 80112.

2.      All of FODS' members are citizens of either Colorado, Utah, Minnesota, South Carolina, or Arizona. Accordingly, no FODS members are citizens of either North Carolina or Florida.

3.      On information and belief, Low Impact Technologies USA, Inc. ("LIT") is a corporation organized and existing under the laws of North Carolina, with its principal place of business at 269 Cane Creek Road, Fletcher, NC 28732.

4.      On information and belief, D&D Manufacturing, LLC ("D&D") is a limited liability company organized and existing under the laws of Florida, with its principal place of business and a registered agent Dale Polk Jr. at 2655 Cherrywood Lane, Titusville, FL 32780.

5.      On information and belief, D&D's sole member is Dale Polk Jr., who, on information and belief, is a citizen of Florida. Accordingly, D&D is a citizen of Florida.

6.      As used herein, the term "Defendants" refers collectively to LIT and D&D.

## II.     JURISDICTION AND VENUE

7.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*; trade dress infringement; unfair competition and false designation of origin; breach of contract; misappropriation of trade secrets; unfair and deceptive acts or practices; tortious interference with prospective economic advantage; and civil conspiracy.

8.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, and 1338(a)-(c).

9.      The court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between FODS and Defendants.

10.     This court has personal jurisdiction over LIT because LIT is incorporated in North Carolina.

11.     This court has personal jurisdiction over D&D because, on information and belief, D&D purposefully availed itself of doing business in North Carolina, and FODS' claims arise out of D&D's business activities in North Carolina. On information and belief, D&D conspired with LIT in North Carolina to manufacture the LIT Accused Product in North Carolina. On information and belief, D&D further maintains a significant place of business and mailing address at 269 Cane Creek Road, Fletcher, NC 28732, which is the same address listed as LIT's

principal place of business. On information and belief, D&D engaged in the wrongful acts alleged herein in North Carolina. On information and belief, D&D is a major investor in LIT.

12. Venue is proper pursuant to 28 U.S.C. § 1400(b) because LIT is incorporated in North Carolina and thus resides in this judicial district. Venue is further proper pursuant to 28 U.S.C. § 1400(a) because LIT resides in this district, because D&D maintains a place of business in this judicial district at 269 Cane Creek Road, Fletcher, NC 28732; and because D&D's agents may be found in this judicial district. For example, on information and belief, D&D's chief financial officer Eddiebee P. Farrar is the corporate secretary of LIT and may be found in this judicial district. On information and belief, D&D's president and managing member Dale Polk Jr. is LIT's chairman and may be found in this judicial district.

13. Venue in this judicial district is also proper pursuant to 28 U.S.C. § 1391(b) because each Defendant resides for purposes of venue in the Western District of North Carolina, as each Defendant is subject to this Court's personal jurisdiction. Additionally, a substantial part of the events and omissions giving rise to FODS' claims occurred in the Western District of North Carolina, and a substantial part of the property that is the subject of this action is situated in the Western District of North Carolina.

## III. ALLEGATIONS GIVING RISE TO PLAINTIFF'S CLAIMS

### A. Plaintiff's Revolutionary FODS Trackout Control Mats

14. FODS manufactures and sells FODS Trackout Control Mats (the "FODS Mats"), which are used at construction sites to effectively clean tires, maintain sediment control, minimize pollution, and ensure compliance with Stormwater Pollution Prevention Plans as well as other federal, state, and local construction requirements.

15. FODS sells the FODS Mats to customers in all 50 states of the United States and to customers in foreign countries.

3

16.     The FODS Mats are made of a durable, flexible, reusable, and recyclable polymer, and contain a unique, pyramid-studded design that effectively removes mud and sediment from vehicle tires without damaging the tire or the ground's surface, as shown below. Although each mat is strong enough to hold millions of pounds and over 20,000 pounds per protrusion, they are light enough to be moved without requiring any heavy equipment, and can be installed in as little as 30 minutes.

 

17.     FODS Mats are used on construction sites, at airports, industrial sites, highway construction, energy projects, land development, and in urban and residential applications.

18.     Since being introduced to the market in 2016, the FODS Mats have transformed the construction industry, offering a reusable, durable, environmentally friendly, and highly effective means of trackout control that has replaced ineffective and costly traditional rock and metal options that require heavy equipment to maintain and remove.

19.     Third-party testing of FODS Mats showed that the FODS Mats reduce trackout up to 59 percent better than traditional methods.

20.     Due to their revolutionary improvements over traditional trackout control products, numerous state transportation and environmental agencies throughout the United States have officially approved the use of reusable trackout control systems, and in some cases the specific FODS Mats, as a best management practice (BMP) for prevention of trackout from construction sites, and an acceptable alternative to traditional trackout control products.

21.     The FODS Mats are used extensively for public and private projects throughout the United States as well as in Asia, the Middle East, Australia, and Europe, and have become the industry standard for construction trackout control.

**B.     The '927 Patent**

22.     On November 22, 2011, the United States Patent and Trademark Office issued U.S. Patent No. 8,061,927 ("the '927 patent"), entitled "VEHICLE TRACKING PAD."  (Copy attached as Exhibit A.)

23.     FODS is the owner of all right, title, and interest in the '927 patent, including the right to sue, enforce, and recover damages for all infringements.

24.     The '927 patent has not expired and is in full force and effect.

25.     Pursuant to 35 U.S.C. § 282, the '927 patent and each of its claims are presumed valid and enforceable.

26.     The '927 patent contains claims, for example claim 1, directed to a vehicle tracking pad for controlling trackout of mud from vehicle tires onto roadways from off-road sites.

**C.     The FODS Trade Dress**

27.     FODS invested significantly in the development of the overall design and appearance of its FODS Mats, with the aim to create an improved trackout control product having a unique appearance that was immediately recognizable by consumers.

28.     To distinguish the FODS Mats from other brands of construction trackout control products in the market, FODS adopted a unique, distinctive, and non-functional trade dress which includes both the overall design and shape of the product, as well as the uniquely shaped rows of pyramid shapes, and the bright yellow color.  The FODS Mats incorporate a distinctive trade dress, as shown below:



22.     Elements of the FODS Trade Dress include: (a) bright yellow-colored, flat rectangular mats; (b) rows of staggered pyramid shaped cones that cover the mats; and (c) a small, flat, triangular-shaped area in the center, without any cones.

23.     All the features of the FODS Trade Dress were adopted for aesthetic purposes and to serve a source-identifying role, namely, FODS adopted each of the features of the FODS Trade Dress to create a unique, memorable design that consumers would immediately recognize and attribute to FODS as the source of the goods.

24.     The FODS Trade Dress is not functional.  None of the features of the FODS Trade Dress are functionally essential to the use of the FODS Mats.  A trackout control product can use many different forms, shapes, and colors.  Numerous alternative shapes and structures for construction trackout products exist, as shown by the examples of commercially available alternatives depicted in the table below:

| **Rattle Grate**<br>https://contractors-services.us/rattle-grate/ | **Sterling Clean Exit mats**<br>https://www.sterlingsolutions.com/product/clean-exit/ |
| --- | --- |
|  | |
| **Grizzly**<br>https://trackoutcontrol.com/wp-content/uploads/2021/02/Grizzly-Brochure.pdf | **Tracking Pads, LLC**<br>https://trackingpads.com/ |
|  |  |
| **RubberForm Trackout Control Mats**<br>https://rubberform.com/product/trackout-control-mat/ | **Rattle Track**<br>https://contractors-services.us/rattle-track/ |







**Rubberosion Eco Vehicle Tracking Pad**
https://www.rubberosion.com/evt



**Ages Mud Mats**
https://interfaceh2o.com/wp-
content/uploads/2020/04/Mud-Mat-Ih2o-
copy.pdf



25. As shown by the wide variety of appearances of trackout control products

available in the market, a sampling of which are shown above, competitors are not at a

significant, non-reputation related disadvantage by FODS' exclusive use of the FODS Trade Dress. Those third-party products use designs that are markedly different than that of the FODS Trade Dress.

26. In addition, the design features of the FODS Trade Dress are not comparatively simple or inexpensive to manufacture because the unique design elements of the FODS Mats require the creation and use of custom molds and expensive coloring. Manufacturing FODS Mats with their unique rows of staggard pyramid cones is more expensive than manufacturing flat trackout mats made of polymer and plastic composites, or geotextile fabric.

27. Although FODS also owns U.S. Patent No. 8,061,927, which is a utility patent directed to "Vehicle Tracking Pad," and which generally covers a vehicle tracking pad for controlling trackout of mud from vehicle tires onto roadways from off-road sites, this patent does not cover any of the specific, particular design features of the FODS Trade Dress.

28. Since FODS launched its FODS Mats in the United States in July 2016, the FODS Mats and associated FODS Trade Dress quickly gained the attention of the media and the relevant public.

29. Numerous news media have discussed the overall design and appearance of the FODS Mats as unique and/or memorable. For example, Stormwater Solutions Magazine noted in June 2019 that the Colorado Department of Transportation ("CDOT") signed a public-private partnership contract with Kiewit Meridiam Partners LLC (KMP) to build, finance, operate, and maintain the $1.2 billion repair, rehabilitation, and replacement of Interstate 70 for 30 years, wherein "KMP used the FODS trackout control system to prevent construction debris pollution from exiting worksites and entering storm water runoff, meeting CDOT's best management practices." *See* Exhibit B (depicting FODS Mats on cover).

30.     Further, in 2020, as part of its annual Environmental Excellence Awards, the International Erosion Control Association (IECA) selected FODS Mats as one of two finalists for the "Innovation, Contribution, or Education" (ICE) award, which recognizes the developments of manufacturers, educators, and innovative ideas which improve on best management practices and help engineers better protect local water sources.

31.     FODS has invested significant amounts of money and substantial effort towards nationwide and international promotion of its FODS Mats, including promoting its FODS Mats at many tradeshows and conferences for the construction industry each year since 2015.

32.     Since launching its FODS Mats in July 2016, FODS has earned an estimated aggregate sales revenue of $51 million for its sales of its FODS Mats worldwide.

33.     FODS has continuously sold its FODS Mats incorporating the FODS Trade Dress in U.S. commerce since it launched the product in July 2016.

34.     As a result of FODS' extensive use and promotion of the FODS Trade Dress, FODS has achieved great commercial success and widespread commercial recognition of the FODS Trade Dress as an indicator of source, and FODS has acquired valuable common law rights in the FODS Trade Dress.

35.     The FODS Trade Dress is an invaluable asset essential to FODS' success, and represents the design of its signature product, the FODS Trackout Control Mats.

**D.     D&D Enters into Agreements to Manufacture FODS Mats for FODS.**

36.     In April 2016, Plaintiff FODS and Defendant D&D entered into a Manufacturing Services and Supply Agreement (the "2016 Agreement") whereby FODS engaged D&D to manufacture FODS Mats covered by one of more claims of the '927 patent, and incorporating the FODS Trade Dress.  *See* Exhibit C.

37.     The 2016 Agreement granted D&D a limited license to use FODS' "intellectual property" only as necessary to perform its obligations under the agreement, and no right or title to FODS' intellectual property was transferred or sold to D&D.  *See* Exhibit C, Section 6.

38.     "Intellectual property" included, among other things, trade secrets, research and development, know-how, compositions, designs, drawings, diagrams, inventions, designs, formulae, flow charts, specifications, patents, customer lists, and customer information. *Id.*, Section 6(e)(i).

39.     Moreover, the 2016 Agreement provided all "Improvements" to the product design or related patent as a result of the agreement shall be owned by FODS.  *Id.*, Section 6(c).

40.     "Improvements" were defined to include, among other things, all intellectual property made, invented, developed, created, conceived, or reduced to practice following the enactment of the 2016 Agreement. *Id.*, Section 6(e)(iii).

41.     The 2016 Agreement also contained a "Confidentiality" provision that, among other things, forbade D&D from using any confidential information for any purpose whatsoever besides manufacturing the FODS Mats or from disclosing the confidential information to a third party. *Id.*, Section 11.

42.     The 2016 Agreement defined "Confidential Information" as any information, technical data, or know-how, including, but not limited to, research, product plans, products, services, pricing data and information, shipment quantity data and information, customers, markets, software, developments, engineering, inventions, processes, designs, drawings, research, manufacturing, marketing, finances or employment or consulting information of the disclosing party. *Id.*

43.     The 2016 Agreement specified that the Confidentiality provision would survive expiration or termination of the 2016 Agreement for a period of five calendar years. *Id.*

44.     The 2016 Agreement became effective immediately upon signing and had an "Initial Term" of two years, which would be followed by automatic one-year renewals unless either party provided adequate prior notice of intent to terminate the contract. *Id.*, Section 1.

45.     Around the time when the Initial Term of the 2016 Agreement was set to expire, in April 2018, Plaintiff FODS and D&D entered into a new Manufacturing Services and Supply Agreement (the "2018 Agreement") whereby FODS engaged D&D to manufacture FODS Mats covered by one of more claims of the '927 patent, and incorporating the FODS Trade Dress. *See* Exhibit D.

46.     The 2018 Agreement specified that the 2018 Agreement contained "the entire agreement of the Parties," that there were "no agreements" related to manufacturing of the FODS Mats other than the 2018 Agreement, and that the 2018 Agreement "supersede[d] any and all other agreements" related to manufacturing of the FODS Mats. *Id.*, Section 12(d).

47.     As such, the 2016 Agreement terminated and expired in April 2018. The 2016 Agreement's Confidentiality Provision, however, survived for five years following the 2016 Agreement's expiration until April 2023.

48.     Like the 2016 Agreement, the 2018 Agreement became effective immediately upon signing and had an "Initial Term" of two years that would be automatically renewed for successive one-year periods unless either party provided adequate notice of the contract's termination. *Id.*, Section 1.

49.     As with the 2016 Agreement, the 2018 Agreement granted D&D a limited license to use FODS' "intellectual property" only as necessary to perform its obligations under the

agreement, and no right or title to FODS' intellectual property was transferred or sold to D&D. *See id.*, Section 6.

50.     Like the 2016 Agreement, the definition for "Intellectual property" in the 2018 Agreement included, among other things, trade secrets, research and development, know-how, compositions, designs, drawings, diagrams, inventions, designs, formulae, flow charts, specifications, patents, customer lists, and customer information. *Id.*, Section 6(e)(i).

51.     Like the 2016 Agreement, the 2018 Agreement also provided all "Improvements" to the product design or related patent as a result of the agreement shall be owned by FODS. *Id.*, Section 6(c).

52.     Like the 2016 Agreement, "Improvements" were defined by the 2018 Agreement to include, among other things, all intellectual property made, invented, developed, created, conceived, or reduced to practice following the enactment of the 2016 Agreement. *Id.*, Section 6(e)(iii).

53.     Like the 2016 Agreement, the 2018 Agreement also contained a "Confidentiality" provision that, among other things, forbade D&D from using any confidential information for any purpose whatsoever besides manufacturing the FODS Mats or from disclosing the confidential information to a third party. *Id.*, Section 11.

54.     Like the 2016 Agreement, the 2018 Agreement specified that the Confidentiality provision would survive expiration or termination of the 2018 Agreement by five calendar years. *Id.*

55.     Accordingly, the 2018 Agreement's Confidentiality Provision survived until at least April 2023 due to the five-year survival term.

56.     Like the 2016 Agreement, the 2018 Agreement defined "Confidential Information" as any information, technical data, or know-how, including, but not limited to, research, product plans, products, services, pricing data and information, shipment quantity data and information, customers, markets, software, developments, engineering, inventions, processes, designs, drawings, research, manufacturing, marketing, finances or employment or consulting information of the disclosing party. *Id.*

57.     FODS goes to great lengths to protect its confidential, proprietary, and trade secret information. This information is only available to FODS' employees on a "need to know basis" and is subject to obligations embodied in, among other things, agreements between FODS and its employees and third-party contractors, as well as FODS' internal policies and procedures addressing confidential, proprietary, and trade secret information.

58.     In or around 2019, FODS entered into a manufacturing agreement with Spartan Composites ("Spartan") to produce the FODS Mats when Spartan acquired the manufacturing facilities of D&D. FODS' plan was for Spartan to exclusively produce the FODS Mats.  As a result of Spartan's acquisition of D&D's manufacturing facility, Dale Polk, Jr. worked as an ongoing consultant to Spartan post-acquisition.

59.     By sometime in 2019, Spartan had begun producing and manufacturing the FODS Mats.

60.     In fulfilling the terms of their respective manufacturing agreements, Spartan, Dale Polk, Jr., and D&D had access to FODS' intellectual property, confidential information, trade secrets, and customer lists and information related to the FODS Mats, among other things.

61.     To the date of this filing, D&D remained subject to the 2016 Agreement's and 2018 Agreement's Confidentiality Provisions.

**E.     D&D Conspires with LIT to Unlawfully Produce, Market, and Sell the LIT Accused Product.**

62.     In November 2020, LIT filed its Articles of Incorporation with the North Carolina Secretary of State.

63.     In December 2020, LIT filed an annual report with the North Carolina Secretary of State that designated Dale E. Polk, Jr. as an officer with the title of "Chairman."

64.     In December 2021, LIT filed another annual report with the North Carolina Secretary of State that again designated Dale E. Polk, Jr. as an officer with the title of "Chairman."

65.     LIT's principal place of business has the same address as that listed as D&D's mailing address on the Florida Secretary of State website.

66.     Upon information and belief, Dale E. Polk, Jr. is also the president and managing member of D&D.

67.     Upon information and belief, Dale E. Polk, Jr., as president and managing member of D&D, would have known and had access to confidential information and trade secrets related to the FODS Mats, among other things, while serving as Chairman for LIT.

68.     Upon information and belief, D&D, acting through its authorized representative and president Dale E. Polk, Jr., shared this confidential information and trade secrets that it obtained as a result of the 2016 Agreement and 2018 Agreement with LIT.

69.     Upon information and belief, prior to and at the latest by January 2023, Jason Techau had begun working for LIT in a sales capacity.

70.     Upon information and belief, Jason Techau previously worked for Spartan and D&D, and was involved in the production, manufacturing, and selling of the FODS Mats to customers.

71.     Upon information and belief, Jason Techau would have known and had access to confidential information and trade secrets related to the FODS Mats, including customer lists and customer information, while working for LIT.

72.     By January 2023 and while the 2016 Agreement's and 2018 Agreement's Confidentiality Provisions were in effect, well after the commercial launch of FODS Mats, and well after the FODS Trade Dress had acquired secondary meaning, LIT, in conspiracy with D&D, had begun marketing, promoting, manufacturing, and selling in the United States the "Tread On Me" trackout mat, also marketed as the "**TOMS Mat**" (the "LIT Accused Product").

73.     Upon information and belief, Defendants created and designed the LIT Accused Product by relying on FODS' trade secrets, intellectual property, and confidential information.

74.     Defendants' LIT Accused Product directly infringes at least claim 1 of the '927 patent, as well as uses a design that is confusingly similar to – if not identical to[1] – the FODS Trade Dress.  A comparison of the parties' products is shown below.

| Plaintiff's FODS Mats | Defendants' LIT Accused Product ("TOMS Mat") |
|---|---|
|  |  |

---

[1] LIT by and through at least Jason Techau has informed its potential customers that the TOMS Mat is "basically identical to the FODS Mat."

 

75.     On or about January 21, 2023, LIT admitted in response to FODS' cease and desist letter that LIT was aware of the '927 patent.

76.     Upon information and belief, D&D was aware of the '927 patent and the FODS Trade Dress at least by or around April 4, 2016, when D&D and FODS entered into the 2016 Agreement.  *See* Exhibit C (2016 Agreement).

77.     LIT was aware of the '927 patent at least by or around LIT's date of incorporation of November 3, 2020, because LIT's Chairman Dale Polk Jr. was the signor on behalf of D&D to the 2018 Agreement between FODS and D&D whereby D&D agreed to manufacture trackout mats on behalf of FODS covered by one or more claims of the '927 patent, and that incorporated the FODS Trade Dress.  See Exhibit D (2018 Agreement).

78.     As shown above, Defendants' LIT Accused Product has copied the non-functional, distinctive features of the FODS Trade Dress and, accordingly, the overall appearance and commercial impression of Defendants' LIT Accused Product is confusingly similar to the overall appearance and commercial impression of the FODS Trade Dress.  Indeed, Jason Techau described the LIT Accused Product, the "TOMs mat," as "basically identical to the FODS mat" in correspondence with a current customer of FODS.

79.     Defendants are not authorized or licensed to manufacture, promote, advertise, offer to sell, sell, and/or distribute any product incorporating or using the FODS Trade Dress or any confusingly similar variations.

80.     Defendants are direct competitors of FODS and the FODS Mats.

81.     Defendants' LIT Accused Product and the FODS Mats are marketed to the same customers.

82.     Upon information and belief, Defendants relied on FODS' customer list and customer information to target these customers, which customer lists and information Defendants knew about and had access to through, among other things, D&D's status as manufacturer and Jason Techau's involvement with Spartan.

83.     Indeed, Defendants would have known about each of FODS' customers for the FODS Mat, the delivery hours for each customer, each customer's address, the volume of FODS Mats purchased by each customer, and the packing slip FODS used for each customer, based on D&D's knowledge of same.

84.     Indeed, in January 2023, FODS learned that Defendants had contacted multiple of FODS' existing or potential customers, offering to sell them the unauthorized LIT Accused Product, marketing it as a "replacement" for, and "identical" to, the FODS Mats.

85.     Upon information and belief, these existing customers included, among others, Ground-Guards, Ltd. ("Ground-Guards"), Yak Mat, LLC ("Yak Mat"), and JWA Oilfield Supplies, Ltd. ("JWA").

86.     Jason Techau, acting as Defendants' salesperson, sent a message to a Yak Mat employee, asking if Yak Mat would be interested in purchasing the LIT Accused Product and

stating that he met a Yak Mat employee through his work selling the FODS Mat while at Spartan.

87.    Jason Techau's message specified that he was "now working for a company called LIT with a gentleman named Dale Polk who is the inventor of the plastic delivery technology for making large composite mats."

88.    Jason Techau's message further provided that LIT had "manufactured and tested a new FODS mat replacement called the TOMS mat. It's basically identical to the FODS mat and can be connected to it."

89.    Jason Techau's message then specified Defendants could sell the TOMS Mat at a 40% discount to the FODS Mat.

90.    Upon information and belief, Yak Mats's principal place of business is in Mississippi.

91.    On or about January 11, 2023, Jason Techau contacted Ground-Guards offering the TOMS Mat as a discounted price relative to the price of the FODS Mat.

92.    To keep Ground-Guards' business buying FODS Mats, FODS had to lower its offering price to Ground-Guards by about 40%.

93.    Upon information and belief, Ground-Guards' principal place of business in the United Kingdom.

94.    Sometime in late 2022 or early 2023, JWA told FODS on a phone call that it intended to make a purchase of FODS Mats. That purchase never materialized.

95.    Despite purchasing about $300,000.00 to $400,000.00 in FODS Mats in 2022, JWA has not placed any orders for FODS Mats in 2023.

96.    Upon information and belief, JWA's principal place of business is in Australia.

97.     D&D, through its managing member Dale Polk, Jr. was personally introduced to employees of JWA during a plant tour in 2019 as a guest of FODS.

98.     Therefore, and as these examples demonstrate, Defendants' advertising, promotion, offering for sale, sale, and/or distribution of the LIT Accused Product is likely to cause retailers and customers to be confused or deceived, or mistakenly believe that Defendants' LIT Accused Product is sponsored, endorsed, authorized by, or in some other manner affiliated with FODS, when it is not.

99.     Upon information and belief, Defendants intended to blatantly copy FODS' proprietary design and pass off their goods as FODS' high quality FODS Mats to misappropriate the immense goodwill that FODS has invested enormous time, effort, and expense to cultivate in the marketplace.

100.    Defendants' unlawful acts have caused FODS to suffer irreparable injury to its business, and to the goodwill and reputation symbolized by the FODS Trade Dress. FODS will continue to suffer substantial loss and irreparable injury unless and until Defendants are enjoined from their wrongful acts.

## CAUSES OF ACTION

## COUNT I: WILLFUL INFRINGEMENT OF THE '927 PATENT

101.    FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

102.    Defendants, without license or authorization to do so, directly infringe the '927 patent by manufacturing, selling, offering for sale, renting, using, or otherwise making available the LIT Accused Product resulting in direct infringement of at least claim 1 of the '927 patent.

103.    The LIT Accused Product is a vehicle tracking pad and system for cleaning tires and controlling trackout of mud from vehicle tires onto roadways from off-road sites. For

example, as depicted in the images below, the LIT Accused Product is a high-density polyethylene (HDPE) trackout system comprised of individual mat sections that may be affixed to the ground and interlocked together.







104.    The LIT Accused Product comprises a mat body configured in a regular geometric shape of predetermined length, having top and bottom major faces, defining first and second opposite longitudinal end edges.  As depicted in the annotated image below, the LIT Accused Product is a rectangular-shaped mat with a predetermined length of approximately 7' (seven feet), with a top surface and a bottom surface that define opposite long (end) edges of the mat.



MAT BODY IN REGULAR
GEOMETRIC SHAPE (RECTANGLE)

PREDETERMINED LENGTH (~ 7')

OPPOSITE LONG EDGE

TOP SURFACE

OPPOSITE LONG EDGE

BOTTOM SURFACE

105.    The LIT Accused Product further comprises the opposite longitudinal end edges suited for mating with like mat bodies when arranged in a series therewith to establish an egress path of greater length than said predetermined length.  As depicted in the annotated image below, the LIT Accused Product can be mated with additional LIT mats and arranged in a series to create a trackout path longer than the length of an individual LIT mat.





106.     The LIT Accused Product further comprises the mat formed of flexible material accommodating irregular ground surface.  The LIT Accused Products are comprised of HDPE that is flexible and capable of adapting to the contours of the underlying ground.

107.     The LIT Accused Product further comprises a finish on said top surface of said mat body defining a plurality of laterally and longitudinally localized, spaced apart, upstanding structures configured to locally deform a tire for removing mud from vehicle tires rolling over said upstanding structures, wherein at least some of said upstanding structures are equivalent to upstanding structures that have a height in the range from four to six inches.  As depicted in the images below, the top surface of the LIT Accused Products comprises an array of raised scalloped pyramids which are distributed laterally and longitudinally along the top surface. These raised scalloped pyramids remove mud from vehicle tires by deforming the tire at the point of contact with the cone.  At least claim 1 of the '927 patent requires that some of the upstanding structures are at least 4" tall and not more than 6" tall.  The raised scalloped pyramids on the LIT Accused Products are at least equivalents of that which is claimed and therefore directly infringe under the doctrine of equivalents, at least because they perform substantially the

same function of knocking mud off vehicle tires in substantially the same way of locally deforming the vehicle tire to achieve substantially the same result of reducing mud trackout from construction sites.





Case 1:23-cv-00059-MR    Document 1    Filed 03/08/23    Page 26 of 44



108.    As such, the LIT Accused Product directly infringes at least claim 1 of the '927 patent, under the doctrine of equivalents, when the LIT Accused Products are made, used, offered for sale, sold, rented, or otherwise made available in the United States by Defendants.

109.    At all times relevant to this cause of action, Defendants have indirectly infringed at least claim 1 of the '927 patent by contributing to and/or inducing the direct infringement of at least claim 1 of the '927 patent by their customers, distributors, vendors, and/or retailers, at least by causing others to sell, offer for sale, use, or otherwise make available the LIT Accused Products.  On information and belief, Defendants encourage, instruct, educate, and/or direct their customers, distributors, vendors, and/or retailers to directly infringe at least claim 1 of the '927 patent, by, for example, disseminating informational and advertising materials for the LIT

Accused Product. For example, as seen in the image below, Defendants instruct their customers on how to assemble multiple LIT Accused Products into infringing systems. *See* Exhibit E.



110.    The LIT Accused Product is not a staple article of commerce and has no substantial non-infringing use. The LIT Accused Product is not designed for any purpose other than to function as a vehicle trackout mat used to remove mud from the tires of vehicles moving from an off-road site to a roadway.

111.    Defendants know and at all relevant times have known of the '927 patent and their infringement of the '927 patent. For example, on information and belief, Defendants were aware that the FODS product was covered by one or more claims of the '927 patent and that the LIT Accused Product is a knowing and intentional copy of the FODS product. On information and belief, Defendants have informed at least one of their customers that the LIT Accused Product is identical to the FODS product and can be connected to the FODS product.

112.    Because Defendants know and at all relevant times have known of the '927 patent and their infringement of the '927 patent, Defendants' infringement is deliberate and willful.

113.    FODS has been and continues to be damaged and irreparably harmed by Defendants' infringement of the '927 patent.

114.    Upon information and belief, such infringement has been, and will continue to be, willful, and upon further belief, Defendants lack any reasonable invalidity or non-infringement defenses making this case exceptional and entitling FODS to increased damages and reasonable attorney's fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II: FEDERAL TRADE DRESS INFRINGEMENT
### (15 U.S.C. § 1125(a))

115.    FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

116.    FODS owns common law rights in the FODS Trade Dress, which is comprised of: (a) bright yellow-colored, flat rectangular mats; (b) rows of staggered, pyramid-shaped cones covering the mats; and (c) a small, flat, triangular-shaped area in the center without any cones.

117.    FODS has used the FODS Trade Dress consistently and continuously in the United States since it was adopted in 2016.

118.    The FODS Trade Dress is primarily non-functional and is highly distinctive.

119.    Consumers and the general public have come to recognize the FODS Trade Dress as identifying FODS Mats and their source, and thus the FODS Trade Dress has acquired secondary meaning.

120.    Moreover, upon information and belief, Defendants intentionally copied the FODS Trade Dress, which creates a presumption of secondary meaning.

121.    Defendants are not authorized to use the FODS Trade Dress.

122.     After FODS' adoption and use of the FODS Trade Dress, and the development of secondary meaning in that trade dress, Defendants have manufactured, advertised, promoted, offered for sale, and/or sold products, including the LIT Accused Product, that use trade dress that is identical and confusingly similar to the FODS Trade Dress.  An example of Defendants' infringing use of the FODS Trade Dress is shown below:

| Plaintiff's FODS Mats Incorporating the FODS Trade Dress | Defendants' LIT Accused Product ("TOMS Mat") |
|---|---|
|  | |

123.     Defendants' unauthorized use of the FODS Trade Dress is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods are manufactured or distributed by FODS, are associated, or connected with FODS, or have been sponsored, endorsed, or approved by FODS.

124.     Defendants' acts demonstrate an intentional, willful, and malicious intent to trade on the goodwill that FODS has developed in the FODS Trade Dress in connection with its FODS Mats.

125.     Defendants' acts constitute trade dress infringement in violation of 15 U.S.C. § 1125(a).

126.     FODS has suffered damages and Defendants have obtained profits and/or unjust enrichment as a result of Defendants' wrongful conduct.

127.    Defendants' acts irreparably injure FODS' business, reputation, and goodwill. Unless Defendants are enjoined from their wrongful conduct, FODS will continue to suffer irreparable injury and harm, for which it has no adequate remedy at law.

## COUNT III: FEDERAL UNFAIR COMPETITION & FALSE DESIGNATION OF ORIGIN
### (15 U.S.C. § 1125(a))

128.    FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

129.    Defendants' FODS Trade Dress has come to identify the FODS Mats and their source.

130.    Through their unauthorized use of the FODS Trade Dress for their competing trackout control mats, Defendants are knowingly and intentionally misrepresenting and falsely designating to the general public the affiliation, connection, association, nature, origin, source, endorsement, sponsorship, and approval of their mats, so as to create a likelihood of confusion among the public as to the affiliation, connection, association, nature, origin, source, endorsement, sponsorship, and approval of their mats.

131.    Defendants' acts demonstrate an intentional, willful, and malicious intent to trade on the goodwill that FODS has developed in the FODS Trade Dress in connection with its FODS Mats.

132.    Defendants' acts constitute unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a).

133.    FODS has suffered damages and Defendants have obtained profits and/or unjust enrichment as a result of Defendants' wrongful conduct.

134. Defendants' acts irreparably injure FODS' business, reputation, and goodwill. Unless Defendants are enjoined from their wrongful conduct, FODS will continue to suffer irreparable injury and harm, for which it has no adequate remedy at law.

## COUNT IV: BREACH OF CONTRACT

135. FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

136. At the times complained of herein, the 2016 Agreement's and the 2018 Agreement's Confidentiality Provisions remained binding on both FODS and D&D.

137. D&D violated and continues to violate both the 2016 Agreement's and the 2018 Agreement's confidentiality provisions by sharing FODS' confidential information – including, among other things, information related to FODS' customers, products, inventions, engineering, research, processes, manufacturing, and product plans – with LIT through its authorized agent, Dale Polk, Jr.

138. D&D's actions in sharing this confidential information with LIT constitute material breaches of the 2016 Agreement and 2018 Agreement.

139. D&D's material breaches of the 2016 Agreement and the 2018 Agreement have proximately caused damages to FODS by, among other things, causing FODS to lose business related to the FODS Mat and otherwise causing its confidential information to be exposed.

140. FODS is entitled to recover damages arising from D&D's material breaches in an amount to be proven at trial.

## COUNT V: MISAPPROPRIATION OF TRADE SECRETS
### (under 18 U.S.C. § 1836(b)(1))

141. FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

142. FODS holds business, technical, scientific, and engineering information relating to the FODS Mat, including patterns, formulas, methods, prototypes, techniques, and processes for marketing, producing, advertising, developing, and selling the FODS Mats.

143. This information constitutes trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

144. D&D had access to FODS' trade secrets through its involvement in manufacturing the FODS Mats.

145. LIT had access to FODS' trade secrets through D&D's sharing of the trade secrets with LIT and Jason Techau's access to trade secrets through his prior employment with Spartan.

146. FODS undertook reasonable efforts under the circumstances to maintain the secrecy of their trade secrets related to the FODS Mats. Among other measures, FODS kept locked, physical storage of its property with 24/7 monitored security; utilized encrypted file sharing; and maintained contractual confidentiality requirements with third-party vendors and partners.

147. FODS' trade secrets derive independent and potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from their disclosure or use.

148. Defendants, by engaging in the acts complained of herein, have misappropriated FODS' trade secrets, as that term is defined in 18 U.S.C. § 1839(3), in violation of the Defend Trade Secrets Act.

149. Upon information and belief, Defendants have misappropriated technical trade secrets relating to, among other things, the FODS Mat prototype, CAD drawings related to the FODS Mat, the FODS Mat ramp design, and negative know-how concerning the FODS Mat,

including information like which colorants not to use for these kinds of mats or which processes should be used to develop these mats.

150. Upon information and belief, Defendants have also misappropriated business trade secrets, including, but not limited to, customer lists and business plans.

151. Upon information and belief, Defendants knew about each of FODS' points of contact with customers, the delivery hours for each customer, each customer's address, the volume of FODS Mats purchased by each customer, and the packing slip FODS used for each customer.

152. Defendants utilized these trade secrets to promote, market, and sell the LIT Accused Product, to the detriment of FODS.

153. Defendants knew, or should have known, that these trade secrets were acquired by improper means, as FODS undertook considerable efforts to maintain the secrecy of these trade secrets.

154. FODS never gave express or implied consent or authority to Defendants to use any of the aforementioned trade secrets.

155. The misappropriated trade secrets implicate interstate and foreign commerce, as FODS sold the FODS Mat from Colorado to businesses located in various states throughout the United States and to businesses located abroad, Defendants conducted their illegal activities from North Carolina, and Defendants used the misappropriated trade secrets to take FODS' clients that were located in multiple states and countries.

156. Defendants' misappropriation of FODS' trade secrets was willful and malicious. As a result, FODS should be awarded exemplary damages and reasonable attorney's fees under 18 U.S.C. § 1836(b).

34

157.    Defendants continue to misappropriate or threaten to misappropriate FODS' trade secrets, causing FODS irreparable harm. As a result, FODS is entitled to an injunction preventing Defendants from further actual or threatened misappropriation of FODS' trade secrets under 18 U.S.C. § 1836(b)(3)(A)(i).

158.    As a direct and proximate result of Defendants' misappropriation of trade secrets, FODS has sustained damages in excess of $5 million dollars, in an amount to be proven at trial.

**COUNT VI: MISAPPROPRIATION OF TRADE SECRETS UNDER STATE LAW**

159.    FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

160.    FODS holds business, technical, scientific, and engineering information relating to the FODS Mat, including patterns, formulas, methods, prototypes, techniques, and processes for marketing, producing, advertising, developing, and selling the FODS Mats.

161.    This information constitutes trade secrets.

162.    D&D had access to FODS' trade secrets through its agreement to manufacture the FODS Mats in the 2016 Agreement and 2018 Agreement.

163.    LIT had access to FODS' trade secrets through D&D's sharing of the trade secrets with LIT and Jason Techau's access to trade secrets through his prior employment with Spartan.

164.    FODS undertook reasonable efforts under the circumstances to maintain the secrecy of their trade secrets related to the FODS Mats. Among other measures, FODS kept locked, physical storage of its property with 24/7 monitored security; utilized encrypted file sharing; and maintained contractual confidentiality requirements with third-party vendors and partners.

165. FODS' trade secrets derive independent and potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from their disclosure or use.

166. Defendants, by engaging in the acts complained of herein, have misappropriated FODS' trade secrets.

167. Upon information and belief, Defendants have misappropriated technical trade secrets relating to, among other things, the FODS Mat protype, CAD drawings related to the FODS Mat, the FODS Mat ramp design, and negative know-how concerning the FODS Mat, including information like which colorants not to use for these kinds of mats or which processes should be used to develop these mats.

168. Upon information and belief, Defendants have also misappropriated business trade secrets, including, but not limited to, customer lists and business plans.

169. Upon information and belief, Defendants knew about each of FODS' points of contact with customers, the delivery hours for each customer, each customer's address, the volume of FODS Mats each customer purchased, and the packing slip FODS used for each customer.

170. Defendants utilized these trade secrets to promote, market, and sell the LIT Accused Product, to the detriment of FODS.

171. Defendants knew, or should have known, that these trade secrets were acquired by improper means, as FODS undertook considerable efforts to maintain the secrecy of these trade secrets.

172. FODS never gave express or implied consent or authority to Defendants to use any of the aforementioned trade secrets.

173.     Defendants' misappropriation of FODS' trade secrets was fraudulent, willful, malicious, and wanton. As a result, FODS should be awarded punitive damages, exemplary damages, and attorneys' fees.

174.     Defendants continue to misappropriate or threaten to misappropriate FODS' trade secrets, causing FODS irreparable harm. As a result, FODS is entitled to an injunction preventing D&D and LIT from further actual or threatened misappropriation of FODS' trade secrets.

175.     As a direct and proximate result of Defendants' misappropriation of trade secrets, FODS has sustained damages in excess of $5 million dollars, in an amount to be proven at trial.

### COUNT VII: UNFAIR AND DECEPTIVE ACTS OR PRACTICES

176.     FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

177.     After FODS' adoption and use of its FODS Trade Dress, and the development of secondary meaning in that trade dress, Defendants manufactured, advertised, promoted, offered for sale, sold, and/or distributed products that use trade dress that is identical and confusingly similar to the FODS Trade Dress, including the LIT Accused Product.

178.     In addition, during Defendants' unauthorized advertisement, promotion, offering for sale, sale, and/or distribution of products that use trade dress that is identical and confusingly similar to the FODS Trade Dress, Defendants made misrepresentations to potential customers that are equivalent to palming or passing off their products as those of FODS, for example, Defendants claimed that their unauthorized "TOMS mat" (LIT Accused Product) is "basically identical to the FODS [Mats]."

179. Defendants' acts constitute unfair or deceptive acts or practices in that Defendants deceptively marketed the LIT Accused Product as "identical" to the FODS Mat. In actuality, the LIT Accused Product was a complete knock-off product.

180. Defendants' unfair or deceptive acts or practices were in or affecting commerce.

181. Defendants' unfair or deceptive acts or practices proximately caused FODS to suffer a loss, as it caused FODS to either lose customers or lose profits from its sale of the FODS Mat.

182. Defendant's unfair or deceptive trade practice significantly impacted the public (i.e., as actual, or potential consumers of the defendant's goods, services, or property) by causing the public to believe the LIT Accused Product provided the same service as the FODS Mat and by falsely representing that Defendants were authorized to sell the LIT Accused Product.

183. FODS has been damaged by Defendants' unfair or deceptive acts or practices in an amount to be determined at trial.

184. FODS is entitled to have any recovery from Defendants be trebled.

185. Defendants' acts irreparably injure FODS' business, reputation, and goodwill. Unless Defendants are enjoined from their wrongful conduct, FODS will continue to suffer irreparable injury and harm, for which it has no adequate remedy at law.

## COUNT VIII: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

186. FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

187. FODS had prospective contracts with at least three customers of the FODS Mat, including Yak Mat, LLC ("Yak Mat"), Ground-Guards, Ltd. ("Ground-Guards"), and JWA Oilfield Supplies, Ltd. ("JWA").

188. Upon information and belief, Defendants knew about these prospective contracts based on Defendants' access to FODS' customer lists and customer information.

189. Defendants intentionally induced Yak Mat, Ground-Guards, and JWA to either not contract at all with FODS or to contract with FODS on much lower terms.

190. Defendants' interference with FODS' prospective economic relationships was done maliciously and without justification because, among other things, Defendants undercut FODS' prices by relying on trade secrets, intellectual property, and confidential information that was misappropriated from FODS.

191. Defendants' malicious and unjustifiable conduct resulted in damages to FODS, including, but not limited to, lost profits and sales relating to YakMat, GroundGuards, and JWA Australia.

192. FODS is entitled to recover damages arising from Defendants' tortious interference in an amount to be proved at trial.

## COUNT IX: CIVIL CONSPIRACY

193. FODS incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

194. Defendants formed and acted upon an agreement between themselves and others presently unknown to market, produce, manufacture, and sell the LIT Accused Product and to provide the funding necessary for such conduct.

195. Defendants' joint actions in marketing, producing, manufacturing, and selling the LIT Accused Product were unlawful acts, in that these actions constituted willful infringement of the '927 Patent, federal trade dress infringement, unfair competition and false designation of

origin, unfair and deceptive trade practices, breach of contract, misappropriation of trade secrets, and tortious interference with prospective economic advantage.

196.    This civil scheme is evident by D&D's sharing with LIT the confidential information and trade secrets D&D obtained through its 2016 Agreement and 2018 Agreement with FODS, by and through Dale E. Polk Jr. as D&D's authorized representative, which confidential information and trade secrets were then used by Defendants to produce, market, and sell the LIT Accused Product.

197.    D&D's and LIT's conspiracy is further evidenced in that the mailing address for D&D is also the address of LIT's principal place of business. D&D is also a major investor in LIT.

198.    D&D's and LIT's conspiracy consisted of an unlawful scheme to misuse FODS' confidential information, misappropriate FODS' trade secrets, infringe FODS' intellectual property, and to bring to the market a competing know-off product.

199.    Defendants' joint actions in marketing, producing, manufacturing, and selling the LIT Accused Product resulted in injury to FODS through, among other things, its loss of enjoyment to the benefits of the '927 Patent and its trade secrets, exposure of confidential information relating to the FODS Mat, loss of customers and profits, and lost business opportunities.

200.    Defendants acted pursuant to a common scheme as evidenced by, among other things, (1) Dale Polk's common involvement as president and managing member of D&D while also serving as LIT's chairman; (2) D&D's and LIT's same physical mailing address in North Carolina; and (3) D&D's sharing of FODS' confidential information to LIT to perpetrate this scheme.

201.     As such, D&D's and LIT's efforts in perpetuating the unlawful sales of the LIT Accused Product should be treated as joint efforts by virtue of the civil conspiracy.

## IV.     PRAYER FOR RELIEF

WHEREFORE, FODS respectfully requests that the Court enter an order granting the following relief:

A.     Finding under 35 U.S.C. § 271 that Defendants have willfully infringed the '927 patent;

B.     Awarding FODS damages under 35 U.S.C. § 284 adequate to compensate FODS for Defendants' willful infringement and continued infringement of the '927 patent;

C.     Trebling or other enhancement of the damages pursuant to 35 U.S.C. § 284 as a result of Defendants' willful and deliberate acts of patent infringement;

D.     Awarding FODS, pursuant to 35 U.S.C. § 284, costs and pre- and post-judgment interest on FODS' compensatory damages;

E.     Finding that this is an "exceptional case" and awarding of FODS its reasonable attorneys' fees, expenses, and costs in this action pursuant to 35 U.S.C. § 285;

F.     Finding that Defendants have infringed the FODS Trade Dress and engaged in federal unfair competition and false designation of origin;

G.     Awarding FODS (1) Defendants' profits; and (2) all damages sustained by FODS, pursuant to 15 U.S.C. § 1117, plus prejudgment interest;

H.     Ordering that the amounts awarded to FODS pursuant to 15 U.S.C. § 1117 shall be trebled;

I.     Finding that this is an "exceptional case" pursuant to 15 U.S.C. § 1117, and awarding FODS its reasonable attorneys' fees and expenses;

J.      Finding a substantial likelihood that Defendants will continue to infringe the FODS Trade Dress unless they are enjoined from doing so;

K.      Issuing an injunction that preliminarily and permanently restrains Defendants and their agents, servants, employees, successors, affiliates, and assigns, and all persons, firms, and corporations acting in active concert or participation with them, from directly or indirectly:

    a.   Using the FODS Trade Dress and/or any confusingly similar variations thereof, in any manner or form, including, without limitation, in the manufacture, promotion, advertising, offering for sale, sale, distribution, and/or licensing of Defendants' LIT Accused Product that is addressed in this Complaint;

    b.   Using any word, term, name, symbol, device, or combination thereof that causes or is likely to cause confusion, mistake, or deception as to the affiliation or association of FODS or its products with Defendants, or as to the origin of Defendants' products, or any false designation of origin, false or misleading description or representation of fact, or any false or misleading advertising;

    c.   Further infringing FODS' rights in and to any of its products protected by the FODS Trade Dress, or otherwise damaging FODS' goodwill or business reputation; and

    d.   Otherwise competing unfairly with FODS in the manufacture, importation, advertising, promotion, offering for sale, sale, and/or distribution of trackout control products.

L.      Ordering Defendants to, at Defendants' expense, withdraw from the market, account for, and properly deliver to FODS any and all products, including Defendants' molds, incorporating the FODS Trade Dress or used to infringe the FODS Trade Dress;

M.      Ordering Defendants, pursuant to 15 U.S.C. § 1116, to serve on FODS within 30 (30) days of service on Defendants of preliminary or permanent injunctive orders, a written report, under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction;

N.      Finding that Defendants have engaged in unfair or deceptive acts or practices;

O.      Awarding FODS monetary relief in amount to be determined by the Court in its discretion as it finds just as an equitable remedy, including all damages sustained by FODS as a result of Defendants' unfair or deceptive acts or practices, and the costs of this action, and that such award to FODS of damages and profits be trebled;

P.      Finding that D&D breached the 2016 Agreement's and 2018 Agreement's Confidentiality Provisions;

Q.      Awarding FODS' any actual damages, in an amount to be proved at trial, arising from D&D's breach;

R.      Finding that Defendants misappropriated FODS' business and technical trade secrets in violation of both federal and state law;

S.      Awarding FODS the actual damages arising from Defendants' misappropriation, punitive and exemplary damages and attorneys' fees;

T.      Issuing a permanent injunction enjoining Defendants from further actual or threatened misappropriation of FODS' trade secrets;

U.      Finding that Defendants tortiously interfered with FODS' prospective economic advantage;

V.      Awarding FODS any actual damages that arose from Defendants' tortious interference;

43

W.    Finding that Defendants engaged in a civil conspiracy to commit the claims outlined in this Complaint; and

X.    Awarding such other and further relief the Court deems warranted and appropriate.

## V.    JURY TRIAL REQUEST

1.    Pursuant to the Seventh Amendment of the United States Constitution, FODS requests trial by jury on all issues properly heard by a jury.

Date:  March 8, 2023                        Respectfully submitted,

<u>/s/ Matias Ferrario</u>
Matias Ferrario (NC Bar No. 38723)
Jason Wenker (NC Bar No. 36076)
William M. Bryner (NC Bar No. 23022)
Andy Rinehart (admission pending) (NC Bar No. 46356)
Chase H. Stevens (NC Bar No. 55099)
KILPATRICK TOWNSEND & STOCKTON LLP
1001 W Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300
Facsimile: (336) 607-7500
mferrario@kilpatricktownsend.com
jwenker@kilpatricktownsend.com
bbryner@kilpatricktownsend.com
arinehart@kilpatricktownsend.com
chstevens@kilpatricktownsend.com

*Attorneys for Plaintiff FODS, LLC*